**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| TONY REALI, Derivatively on Behalf of SPRUCE POWER HOLDING CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> KEVIN GRIFFIN, CHRISTOPHER M. HAYES, JONATHAN J. LEDECKY, SARAH SCLARSIC, THOMAS J. HYNES III, DEBORA M. FRODL, NIHARIKA T. RAMDEV, DIMITRI N. KAZARINOFF, DECLAN P. FLANAGAN, BRIAN PIERN, and JAMES H.R. BRADY, <br><br> Defendants, <br><br> - and - <br><br> SPRUCE POWER HOLDING CORPORATION, <br><br> Nominal Defendant. | Case No. _____ <br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Tony Reali, by and through his undersigned counsel, brings this action derivatively on behalf of nominal defendant Spruce Power Holding Corporation ("Spruce Power" or the "Company") against certain of its current and former officers and directors and other alleged wrongdoers for breaches of fiduciary duty, unjust enrichment, and violations of the federal securities laws. The allegations below are made upon personal knowledge as to Plaintiff and his own acts, and upon information and belief as to all other matters based upon a review of: (a) information publicly disseminated by Spruce Power, including its public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, investor conference transcripts, and

postings on its website; (b) news reports and other publicly available sources; and (c) court dockets, filings, and orders related to pending litigation involving Spruce Power. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.      This is a shareholder derivative action on behalf of Spruce Power asserting claims for breach of fiduciary duty, unjust enrichment, and violations of Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder against certain current or former officers and directors of the Company and other alleged wrongdoers.

2.      Spruce Power is a Delaware corporation formed by the December 21, 2020 merger (the "Merger") of an entity formally known as XL Hybrids, Inc. ("Legacy XL"), Pivotal Investment Corporation II ("Pivotal II," a special purpose acquisition company), and PIC II Merger Sub Corp. (Pivotal II's wholly owned subsidiary).[1] To secure shareholder approval of the Merger, the Individual Defendants (defined herein)—management and directors of these companies— made a series of false and materially misleading statements concerning the Company's business and prospects, causing substantial damage and other harm to Spruce Power (f/k/a XL Fleet Corp.).

3.      As described in the Company's Form 10-Q for the second quarter of 2021, Legacy XL survived the Merger as a wholly owned subsidiary of Pivotal II, and then Pivotal II adopted the corporate name XL Fleet Corp. ("XL Fleet"). At the time, Legacy XL provided electrification for commercial fleets of light to mid-sized trucks. Its only two products converted gasoline-powered trucks manufactured by other companies into hybrid or plug-in hybrid electric vehicles

---

[1] Pivotal II was incorporated on March 20, 2019 and went public on July 16, 2019 (NYSE: PIC).

through a powertrain platform by adding a battery and electric motor. In the lead up to the Merger, Legacy XL was a small startup, with only 56 full-time employees (as of September 2020), had incurred multi-million-dollar losses in 2019 and 2020, and was experiencing a serious cash shortage.

4.      Nevertheless, in Legacy XL and Pivotal II's September 18, 2020 joint press release, the entities aggressively touted XL Fleet's growth potential, pipeline, supply chain production capacity, valuation, and business prospects. The press release stated that "XL has strong demand momentum with a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021." The enormous anticipated post-merger "implied enterprise value" of the Company was "approximately $1 billion." The press release also highlighted certain of Legacy XL's impressive roster of existing clients, including FedEx, The Coca-Cola Company, PepsiCo, Verizon, the City of Boston, Seattle Fire Department, Yale University, and Harvard University. Pivotal II's filings with the SEC the same day represented that Legacy XL had a "Low Risk Path to Dramatic Growth" which could be achieved by "[s]elling existing products to existing customers through existing channels" (emphasis in original). It further stated that Legacy XL's hybrid product could impressively improve miles-per-gallon ("MPG") by around 25% while its plug-in product was "capable of driving up to 50% savings in MPG."

5.      Legacy XL held a conference call on September 18, 2020 to discuss the proposed merger. There, Defendant Dimitri Kazarinoff (then-Legacy XL's Chief Executive Officer) declared this technology was both "proven" and "trusted." During an appearance on CNBC's Squawk Box the same day, Defendant Thomas J. Hynes (Legacy XL's founder and current Chair of Spruce Power's Advisory Board) stated that Legacy XL Fleet had "an established supply chain production capacity" and "a very low risk and low-cost production process compared to other

companies in the industry." In a September 2020 interview with IPO Edge, Defendant Jonathan Ledecky (then-CEO of Pivotal II and current Spruce Power director) stated he was "confident XL Fleet will be successful" and that the Company was positioned "as a first mover in fleet electrification where their fans—the XL shareholders—should have a winning investment." In their public statements and SEC filings, the Individual Defendants claimed that, by 2024, the Company could generate gigantic revenues exceeding $1.37 billion.

6.     In the ensuing months, Legacy XL and Pivotal II (acting through these entities' officers and directors) affirmed and renewed many of these rosy September 2020 statements. For example, the October 2, 2020 Registration Statement includes the same $75 million expected revenue figure for 2021. Furthermore, on October 26, 2020, the companies issued another press release stating: "The Company is revenue-generating today with strong demand momentum, including a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021." A November 12, 2020 amended registration statement filed with the SEC claimed these figures were "important indicators of expected future performance." In a press release the same day, XL Fleet again touted its "established supply chain partnerships." As later revealed, the bulk of these public statements were a farce—the Company's 12-month sales pipeline was mostly fabricated, the 2021 revenue projections were wildly and knowingly unachievable, the combined enterprise was worth a tiny fraction of the represented $1 billion valuation, and XL Fleet's products could not deliver the promised MPG savings.

7.     Additionally, in the Company's October 2, 2020 Registration Statement and later documents filed with SEC, XL Fleet failed to disclose that it had lost its California Air Resources Board ("CARB") approval status in 2019, was unable to secure reapproval in 2020, and was therefore unable to sell cars in California. Nevertheless, in an October 26, 2020 webinar, Defendant

Hynes claimed that XL Fleet "vehicles are getting built and then shipped to the end customer, again, anywhere in the U.S. or Canada" and "We're in about every state except for Alaska at this point," again omitting that the Company could not sell its products in the huge California market.

8.      The precarious nature of XL Fleet's business began to come to light on March 3, 2021, when Muddy Waters Research published a report titled "XL Fleet Corp. (NYSE: XL): More SPAC Trash."[2] This initial Muddy Waters report detailed, among other things, several compelling examples of XL Fleet's $220 million pipeline as a "fiction created under pressure from senior managers," exaggerated sales projections, and its customer base being "grossly overstated" given the Company's many inactive customers. Muddy Waters also reported that, according to former Company employees, XL Fleet's reorder rates were exceptionally low, with many existing XL Fleet customers not reordering due to poor performance, XL Fleet's misleading efficiency claims, and substantial issues with regulatory approval. Following XL Fleet's March 4, 2021 press release responding to the Muddy Waters report and the Company's March 8, 2021 further rebuttal, Muddy Waters published a follow-up report titled "XL Fleet: Not Denying Much, Still SPAC Trash,"[3] pointing out that XL Fleet did not deny many of the initial report's revelations.

9.      These damning Muddy Waters reports shocked investors and caused a precipitous decline in the XL Fleet's stock price when this truth was revealed, with the share price plummeting from $15.41 at the close of trading on March 2, 2021 to $10.48 on March 8, 2021 (a decline of 32% on heavy trading volume), severely damaging shareholder value. The stock has since continued its precipitous decline and now trades below $1.00 per share.

---

[2] *See* https://d.muddywatersresearch.com/content/uploads/2021/03/MW_XL_20210303.pdf.

[3] *See* https://d.muddywatersresearch.com/content/uploads/2021/03/MW_XL_03102021.pdf.

10.     Instead of delivering the forecasted $75 million in revenue for 2021 (more than triple the Company's 2020 $20.3 million full-year revenue), 2021 was a complete disaster for XL Fleet. Its 2021 full-year revenue fell significantly below even 2020 levels—and totaled just $15.6 million (almost a 25% decrease). Additionally, contrary to the Company's represented wide array of high-profile client customers, the Company's Form 10-K for 2020 revealed that just two of XL Fleet's customers together shockingly accounted for 78% of the total 2020 revenues.

11.     The aforementioned wrongful conduct has subjected the Company to litigation on multiple fronts. On March 8, 2021, investors seeking to recoup their losses in XL Fleet stock sued the Company and certain of its officers and directors for violations of the federal securities laws in the U.S. District Court for the Southern District of New York, captioned *In re XL Fleet Corp. Securities Litigation* (Case No. 1:21-cv-02002-JLR) (the "Securities Class Action"). A consolidated complaint was filed on July 20, 2021. In addition to the Company, the Securities Class Action names the following individuals as defendants: Jonathan J. Ledecky, James H.R. Brady, Kevin Griffin, Thomas J. Hynes III, Dimitri N. Kazarinoff, and Brian Piern. Each of these individuals is also named as a defendant herein. By Order dated February 17, 2022, U.S. District Judge Lorna G. Schofield denied the motion to dismiss the Securities Class Action, holding that investors stated actionable claims against the defendants under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995.

12.     Judge Schofield held that the Securities Class Action plaintiffs alleged with particularity that the defendants made false and misleading statements regarding XL Fleet's purported $220 million sales pipeline and revenue projections for 2020 and 2021 because they failed to disclose that these figures were materially overstated due to data manipulation by XL Fleet management. Judge Schofield also found that the complaint adequately alleged facts showing

the defendants acted with a "strong inference of scienter"—or intent to defraud—given their substantial involvement in conducting due diligence into XL Fleet in connection with the Merger or their direct knowledge as senior XL Fleet officers of the exaggerated pipeline and projections figures. The Securities Class Action has exposed the Company to massive liability for securities fraud. The Securities Class Action remains pending and discovery is ongoing.[4]

13.     In addition to the Securities Class Action, a consolidated shareholder class action is currently pending in Delaware Chancery Court (the "State Class Action"), captioned *In re XL Fleet (Pivotal) Stockholder Litigation* (C.A. No. 2021-0808-KSJM). The State Class Action asserts breaches of fiduciary against Pivotal II and Legacy XL officers and directors in connection with their statements and conduct related to the Merger. The State Class Action names the following individuals as defendants: Jonathan J. Ledecky, Kevin Griffin, James H.R. Brady, Sarah Sclarsic, Efrat Epstein, Katrina Adams, Thomas J. Hynes III, and Dimitri N. Kazarinoff. The Company and its controlling stockholder, Pivotal Investment Holdings II LLC, are also named defendants in the State Class Action.

14.     The Company also disclosed that it received a fact-finding inquiry from the SEC on January 6, 2022 regarding the Merger and related matters at issue in the Securities Class Action and State Class Action, raising the prospect of regulatory fines and penalties.

15.     Shareholder value has been severely damaged by the defendants' misconduct. This shareholder derivative action seeks to recoup losses that Spruce Power has sustained, and will continue sustaining, in connection with the defendants' misconduct and wrongdoing.

---

[4] The Securities Class Action was subsequently reassigned to U.S. District Judge Jennifer L. Rochon in September 2022.

16.     In causing the Company to issue false and misleading statements, each defendant named herein acted in bad faith and faces a substantial likelihood of liability for breach of fiduciary duty. In addition, multiple members of Spruce Power Board of Directors (the "Board") are not independent or are otherwise conflicted given their interlocking business relationships and self-interest in the subject matters of this action. Under these circumstances, any demand on the Board to bring the asserted claims would be futile, and is therefore excused, as set forth herein.

17.     On September 9, 2022, XL Fleet acquired Spruce Power, a privately held owner and operator of residential rooftop solar systems in the U.S., and publicly announced the transaction on September 12, 2022. On November 14, 2022, XL Fleet changed its corporate name to Spruce Power. Just two years after the Merger, the Company completely abandoned Legacy XL's primary business—selling hybrid and plug-in hybrid electric powertrain systems—effectively corroborating the frailty of Legacy XL's business. On December 19, 2022, the Company announced it would cease these electric vehicle operations, including all related product development and commercial activities, as of January 1, 2023. It has also sold off the Company's battery inventory and legacy hybrid technology. Engineers and other Company employees working on these shuttered enterprises are expected to be hired by The Shyft Group USA, Inc, which purchased various related technical equipment from Spruce Power and assumed a lease from the Company in connection therewith. Spruce Power now exclusively focuses on operating and distributing solar energy assets, explaining that these recent events "transform our business into a pure-play provider of clean energy solutions to residences and small businesses."

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 21D of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c) and (d) and § 1401. Spruce Power and the individual defendants have conducted business in this District and/or their actions have had an effect in this District, and the Company is incorporated in this District. The Court has personal jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice. In addition, Spruce Power's Second Amended and Restated Certificate of Incorporation includes an exclusive forum selection clause requiring all derivative actions in which the Court of Chancery of the State of Delaware does not have jurisdiction, such as the case here, be brought in this Court.

21.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

## PARTIES

**Plaintiff**

22.     Plaintiff Tony Reali is a current holder of Spruce Power shares and has continuously owned shares during the relevant period. Plaintiff will fairly and adequately represent Spruce Power's interests in this action.

**Nominal Defendant**

23.     Nominal Defendant Spruce Power (f/k/a XL Fleet) is a Delaware corporation with its principal executive offices currently located at 47000 Liberty Drive, Wixom, Michigan. Spruce Power's common stock previously traded on the New York Stock Exchange under the symbol "XL" and currently trades under the symbol "SPRU."

**Director Defendants**

24.     Defendant Kevin Griffin has served as a director of XL Fleet (now Spruce Power) since December 2020 and is a member of its Compensation Committee. Prior to the Merger, Griffin served as a director of Pivotal II beginning in April 2019. He currently holds over 10 million shares of Class A Spruce Power stock, representing approximately 7.3% of all total shares outstanding. Griffin is also an affiliate of Pivotal Spac Funding II LLC, which along with Defendant Ledecky are the two managing members of Pivotal II's sponsor, Pivotal Investment Holdings II LLC (the "Sponsor"). As disclosed in the December 1, 2020 Registration Statement, Griffin and Ledecky "ultimately controlled" the Sponsor. Griffin is CEO and President of special purpose acquisition company Pivotal Investment Corporation III ("Pivotal III"), where he is also a director alongside Ledecky (Chairman), Brady, and Sclarsic. Pursuant to its current amended and restated certificate of incorporation, Pivotal III has only until August 11, 2023 to complete its initial business combination. Griffin also served as a director of Pivotal Acquisition Corp. ("Pivotal I"), a blank check company similar to Pivotal II and Pivotal III, from September 2018 until it consummated its initial business combination with KLDiscovery in December 2019. Following the Pivotal I and KLDiscovery merger, Griffin continues to serve as a director of the combined company. As of April 2022, Griffin held approximately 22.5% of KLDiscovery's total outstanding shares. During 2021, Griffin was paid $270,751 in XL Fleet director fees and stock and option awards.

25.     Defendant Christopher M. Hayes has served as a director of XL Fleet (now Spruce Power) and Chair of its Compensation Committee since December 2020. Hayes was elected as Spruce Power Chair effective January 1, 2023. Hayes also serves as a member of Spruce Power's Nominating and Governance Committee and on its Audit Committee. Prior to that, Hayes served as a director of Legacy XL since May 2018 and on its Finance Committee beginning in August

2019. Hayes has an extensive background in sustainably focused companies, including as the current managing partner and director of Alturus, an infrastructure investment company he founded in 2017. Hayes is also currently a director of N1 Health (formerly Algorex Health Technologies LLC), a company Hayes founded that provides data science technology to the healthcare sector. During 2021, Hayes was paid $297,001 in XL Fleet director fees and stock and option awards.

26.     Defendant Jonathan J. Ledecky has served as a director of XL Fleet (now Spruce Power) since December 2020 and now also serves on its Audit Committee. Prior to that, Ledecky served as Chair and CEO of Pivotal II since its inception, orchestrating the Merger with Hynes. Ledecky and Pivotal Spac Funding II LLC (an affiliate of Griffin) are the two managing members of the Sponsor. As disclosed in the Registration Statement, Griffin and Ledecky "ultimately controlled" the Sponsor. The Registration Statement further notes that Ledecky and Hynes "have been business acquaintances for 10 years as a result of Mr. Ledecky's decades-long relationship with Mr. Hynes' family." He currently holds nearly 10 million shares of Class A Spruce Power stock, representing approximately 6.9% of all total shares outstanding. Ledecky served as Chair and CEO of Pivotal I, a blank check company similar to Pivotal II, from the inception of Pivotal I until in consummated its initial business combination with KLDiscovery in December 2019. Following the merger of Pivotal I with KLDiscovery, Ledecky continued to serve on the board of the combined company until June 2021. As of April 2022, Ledecky held approximately 13.5% of KLDiscovery's total outstanding shares. Ledecky is a director, President, and COO of Northern Star Investment Corp. II, Northern Star Investment Corp. III, and Northern Star Investment Corp. IV, where Brady also serves as an officer of each company and Sclarsic serves on the "Management" team. The Northern Star businesses, like the Pivotal entities, are special purpose

acquisition companies. On February 2021, XL Fleet agreed to a partnership agreement with several entities related to the UBS Arena and the NY Islanders Hockey Club, businesses in which Ledecky is a co-owner. The sponsorship agreement has a three-year term with a sponsor fee of approximately $500,000 annually. Ledecky is also a director and Chair of Pivotal III, alongside Griffin (CEO and President), Brady (CFO), and Sclarsic (director). During 2021, Ledecky was paid $269,501 in XL Fleet director fees and stock and option awards.

27.     Defendant Sarah Sclarsic served as a director of XL Fleet (now Spruce Power) and as a member of its Audit Committee from December 2020 until December 31, 2022 when she resigned from these positions. Prior to the Merger, Sclarsic served as a member of Pivotal II's board of directors since June 2019 and Pivotal II's Audit Committee, and is a current director of Pivotal III. Sclarsic received 50,000 Founder Shares from the Sponsor prior to the IPO, which converted to 50,000 shares of XL Fleet Class A common stock upon the Merger's consummation. Sclarsic is a technology entrepreneur and advisor, consulting for companies in a wide range of areas, from drone delivery to financial software to gene therapy. Sclarsic advises such companies on several matters, including fundraising, business strategy, hiring, and communications. Sclarsic is listed among the "Management" team of Northern Star Investment Corp. II, Northern Star Investment Corp. III, and Northern Star Investment Corp. IV on the companies' websites, where both Ledecky and Defendant Brady serve as officers. During 2021, Sclarsic was paid $279,501 in XL Fleet director fees and stock and option awards.

28.     Defendant Thomas J. Hynes III founded Legacy XL in 2009, previously serving as its CEO from July 2009 through October 2019. He served as its Chief Strategy Officer at the time the Merger was being negotiated. Prior to the Merger, Ledecky had a "decades-long relationship" with Hynes's family, and Ledecky and Hynes had been "business acquaintances" for ten years.

After the Merger, Hynes served as President and as a director of XL Fleet from December 2020 until March 2022, when he resigned from those positions and joined the Company's Advisory Board as its Chair. In connection with his March 2022 resignation, Hynes received lucrative separation pay of approximately $480,000. In 2020 and 2021, Hynes received salary and other compensation from the Company totaling approximately $555,000 and $365,000, respectively. He currently holds more than 7 million shares of Class A Spruce Power stock, representing approximately 5.2% of all total shares outstanding.

29.     Defendant Debora M. Frodl served as Spruce Power Chair and as a director of XL Fleet (now Spruce Power) from the close of the Merger on December 21, 2020 until December 31, 2022, when she retired from these positions. Effective as of the Merger's closing date, Frodl also served on XL Fleet's Audit Committee and its Nominating and Governance Committee (at one point serving as its Chair). Prior to that, Frodl served as a director of the pre-merger Legacy XL entity beginning in May 2018 and as Legacy XL's Chair between July 2019 and December 2020. In addition to her XL Fleet responsibilities, Frodl has served as a member of the board of directors for the following companies: (i) Spring Valley Acquisition Corp., a publicly-traded SPAC focused on sustainability, since November 2020; (ii) Renewable Energy Group, Inc. ("Renewable Energy"), a public company focused on biofuels, since March 2018; and (iii) ITC Holdings Corporation, a private company focused on electricity transmission, since September 2020. Between December 2012 and December 2017, Frodl served as the Global Executive Director for Ecomagination at General Electric Company ("GE") focusing on clean technology strategy. Since 2018, Frodl is a certified Governance Fellow for the National Association of Corporate Directors. During 2021, Frodl was paid $335,443 in XL Fleet director fees and stock and option awards.

30.     Defendant Niharika T. Ramdev served as a director of XL Fleet from December 2020 until May 2022, when Ramdev did not stand for reelection to the Board. During that period, Ramdev served as Chair of XL Fleet's Audit Committee and on the Company's Compensation Committee. At relevant times, Ramdev qualified and was designated as an "audit committee financial expert" as that term is defined in rules adopted by the SEC. Ramdev currently serves as a director of Renewable Energy alongside Frodl. During 2021, Ramdev was paid $557,487 in XL Fleet director fees and stock and option awards.

31.     Defendant Dimitri N. Kazarinoff served as CEO, Principal Financial Officer, and Principal Accounting of XL Fleet from December 2020 until November 2021 when he resigned from the Company. Kazarinoff also served as a director of XL Fleet during this time period. Prior to that, Kazarinoff served as CEO and President of Legacy XL between October 2019 and December 2020. As a result of the Merger, Kazarinoff's Legacy XL stock options converted into 1,206,851 shares of XL Fleet Class A common stock, worth over $23.5 million on the day of the Merger. Pursuant to his lucrative separation agreement with the Company (and approved by the Board), Kazarinoff received total compensation from XL Fleet exceeding $4.8 million for 2021.

32.     Defendant Declan P. Flanagan served as a director of XL Fleet from December 2020 until October 2021, when he resigned from the Company. During that period, Flanagan served as Chair of XL Fleet's Nominating and Corporate Governance Committee. During 2021, Flanagan was paid $530,403 in XL Fleet director fees and stock and option awards.

33.     Defendants Griffin, Hayes, Ledecky, Sclarsic, Hynes, Frodl, Ramdev, Kazarinoff, and Flanagan are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

34.     Defendant Brian Piern served as XL Fleet's Vice President of Sales and Marketing from December 2020 through May 2021. Prior to that, Piern served in the same capacity at Legacy

XL. During his time at XL Fleet and Legacy XL, Piern initially reported directly to CEO Hynes and later directly reported to CEO Kazarinoff. While at XL Fleet, Piern regularly made presentations to the Board. Prior to joining Legacy XL, Piern served as Senior Vice President of Sales at Element Fleet Management from September 2015 to December 2018. Piern previously held the same position at GE Capital, leading the development and execution of multimillion-dollar sales strategies.

35.     Piern, Hynes, and Kazarinoff are referred to herein as the "Officer Defendants."

36.     The Officer Defendants and Director Defendants are collectively referred to herein as the "XL Fleet Defendants."

**Pivotal II Defendants**

37.     Defendant James H.R. Brady served as Chief Financial Officer of Pivotal II prior to the Merger. Brady received 100,000 Founder Shares from the Sponsor prior to the IPO. In addition, he received 100,000 Founder Shares from both Pivotal I and Pivotal III. As Pivotal II's CFO and one of only two Pivotal II's officers, Brady was at all times substantially involved in Pivotal II's activities regarding potential business combinations, including the decision to merge with Legacy XL. Brady further serves as CFO of Northern Star Investment Corp. II, Northern Star Investment Corp. III, and Northern Star Investment Corp. IV, alongside Ledecky. Brady also serves as CFO of Pivotal III.

38.     Defendants Ledecky, Griffin, Brady, and Sclarsic are collectively referred to herein as the "Pivotal II Defendants."

39.     The Officer Defendants, Director Defendants, and Pivotal II Defendants are collectively referred to herein as the "Individual Defendants."

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

40.     By reason of their positions as officers, directors, and/or fiduciaries of XL Fleet (now Spruce Power), and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed, and owe, the Company and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage XL Fleet in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of XL Fleet and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

41.     Each director and officer of the Company owed and owes to XL Fleet (now Spruce Power) and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

42.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

43.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of XL Fleet (now Spruce Power), were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

44.     The misconduct of the Individual Defendants involves culpable violations of their obligations, the absence of good faith on their part, and a reckless disregard for the fiduciary duties owed to XL Fleet and its shareholders, which they were aware or should have been aware posed a risk of serious harm to XL Fleet.

45.     At all relevant times, each Individual Defendant was the agent of each other and of XL Fleet and was acting within the course and scope of such agency.

46.     In addition to these duties, the directors who served on the Company's Audit Committee owed specific and heightened duties to XL Fleet to assist the Board in fulfilling its responsibility to shareholders relating to XL Fleet's "accounting and financial reporting practices and system of internal control" and the "quality and integrity of the Corporation's financial reporting." With respect to "DUTIES AND RESPONSIBILITIES," Subsection IV, the Amended and Restated Audit Committee Charter provides that Audit Committee members shall "[d]iscuss the Corporation's earnings press releases and any financial information provided to analysts and rating agencies."

47.     The Individual Defendants, as officers and/or directors of XL Fleet, were also bound at all relevant times by the Company's Amended and Restated Corporate Code of Conduct and Ethics and Whistleblower Policy, which sets out basic principles to guide all directors, officers, and employees of XL Fleet, who are required to know and conduct themselves in accordance with the code, as well as applicable laws, rules, and regulations. This policy obligated the Individual Defendants to be "honest, fair, and accountable in all business dealings and obligations, and to ensure … full, fair, accurate, timely and understandable disclosure" in the Company's SEC filings and in all public communications made by the Company.

48.     The section of the Amended and Restated Corporate Code of Conduct and Ethics and Whistleblower Policy titled "Accurate Records and Reporting" states that XL Fleet employees, executive, senior management and Board members (together, "associates") "are expected to be familiar with, and to adhere strictly to, [XL Fleet's] internal controls and disclosure controls and procedures." The policy continues, "**Because the integrity of the Company's external reports**

to stockholders and the SEC depends on the integrity of the Company's internal reports and recordkeeping, all associates must adhere to the highest standards of care with respect to our internal records and reporting. The Company is committed to full, fair, accurate, timely, and understandable disclosure in its periodic reports required to be filed with the SEC." (emphasis in original).

49.    Accordingly, the Individual Defendants were responsible for ensuring that disclosures in the Company's reports and other documents filed with the SEC and statements issued publicly were materially complete and contained no misrepresentations or omissions.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

52.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

53.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants,

who are or were directors, officers, and executives of the Company, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

### I.    Company Background and Merger with Pivotal II

55.    A special purpose acquisition company ("SPAC")—sometimes referred to as a "blank check company"—is a publicly listed company designed solely to acquire one or more privately held companies. The SPAC is a shell company when it goes public (*i.e.*, it has no existing operations or assets other than cash and any investments). As defined by the SEC, a SPAC is a company with no operations that offers securities for cash and places substantially all the offering proceeds into a trust or escrow account for future use in the acquisition of one or more private operating companies. Following its initial public offering ("IPO"), the SPAC will seek to identify acquisition candidates and attempt to complete one or more business combination transactions, after which the company will continue the operations of the acquired company or companies as a public company. Typically, the SPAC must successfully complete these transactions within eighteen to twenty-four months, or else the SPAC is dissolved and the money acquired through the IPO is returned to investors—without any compensation paid to the founders and managers of the SPAC. For this reason, as the deadline draws near, SPAC sponsors face increasing pressure to

complete *any* qualifying business combination, ***regardless of its merits***, to prevent SPAC stockholders from redeeming their shares through a dissolution.

56.     In May 2022, U.S. Senator Elizabeth Warren released a report titled "The SPAC Hack: How SPACs Tilt the Playing Field and Enrich Wall Street Insiders" which highlighted issues of misaligned incentives, self-dealing, and fraud which plagued the SPAC industry. The report found that SPAC sponsors' incentives and outcomes did not align with retail investors, leading to low-quality deals that harm investors. By creating a shortcut for private businesses to go public without the disclosure requirements of a traditional IPO, the report also concluded that SPACs incentivize inadequate and even fraudulent disclosures. The SPAC Merger orchestrated here by the Individual Defendants between Legacy XL and Pivotal II was no different.

57.     Pivotal II was founded on March 20, 2019 and filed its preliminary prospectus with the SEC in April 2019. At the time, Pivotal II stated that "[w]hile we may pursue an initial business combination target in any industry or geographic location, we intend to focus our search on companies in North America in industries ripe for disruption from continuously evolving digital technology and the resulting shift in distribution patterns and consumer purchase behavior." Pivotal II continued, "Segments we might explore include, but are not limited to, logistics technology and 'last mile' delivery services, business technology services, on-line cyber security and off-line physical security services, media and entertainment services and franchise businesses." More specifically, Pivotal II intended to focus its search on "companies exploiting disruptive smart phone technology." Legacy XL's business notably did not fit within these objectives. Pivotal II raised $230 million in gross proceeds through its July 2019 IPO. Under the terms of its IPO and NYSE rules, any business combination entered into by Pivotal II was required to have an aggregate fair market value of at least 80% of the value of the assets held in Pivotal II's

Case 1:23-cv-00289-MN   Document 1   Filed 03/16/23   Page 21 of 63 PageID #: 21



trust account through the IPO at the time of execution (net of certain tax obligations and underwriting discounts).

58.     Pivotal II's Amended and Restated Certificate of Incorporation gave it eighteen months to complete a business combination or else liquidate its public shares in cash. Eighteen months from the date of the IPO would have elapsed on January 16, 2021, shortly after the Merger. Increasingly desperate to complete any deal ahead of this deadline, Pivotal II shifted focus away from the targeted industries identified in its Proxy Statements. Failing to consummate a qualifying transaction by January 2021 would have rendered the Pivotal II Defendants' substantial ownership interests in Pivotal II securities and warrants completely worthless—an unacceptable result for the Pivotal II Defendants.

59.     Pivotal II's Sponsor's (Pivotal Investment Holdings II LLC) only two members consisted of Defendant Ledecky (Pivotal II's CEO and Chairman) and Pivotal Spac Funding II LLC (an affiliate of Defendant Griffin). Defendants Griffin and Ledecky "ultimately controlled" the Sponsor according to the Company's December 1, 2020 Registration Statement. They were responsible for identifying a private company target to merge with Pivotal II and negotiating the agreement. Prior to the Merger, Defendants Griffin and Ledecky beneficially owned 19.1% of Pivotal II's Class B common stock. Along with Defendant Sclarsic, Efrat Epstein, and Katrina Adams (who each received 50,000 Pivotal II Founder Shares) and Defendant Brady (who received 100,000 Pivotal II Founder Shares), the Pivotal II affiliated persons controlled 20% of Pivotal II's outstanding equity following the IPO. Accordingly, they could "exert a substantial influence on actions requiring a stockholder vote," and would "continue to exert control at least until the completion of [Pivotal II's] initial business combination," as stated in Pivotal II's Prospectus.

21

60.     Founded in 2009 by Defendant Hynes, Legacy XL remained a small startup in 2020. At the time, the Company provided fleet electrification solutions for Class 2-6 commercial vehicles in North America and generated revenue from the sales of hybrid and plug-in hybrid electric powertrain systems. According to the Company, it had "developed a flexible proprietary electrification powertrain platform that transforms traditional fossil fuel-powered fleet vehicles into hybrid and plug-in hybrid electric vehicles as they are manufactured." Its systems were available on a variety of Class 2-6 vehicles manufactured by Ford, Chevrolet, GMC, and Isuzu, with Legacy XL claiming in 2020 to be on track to provide its systems in Class 7-8 vehicles sometime in 2022. In 2019, Legacy XL lost its CARB certification, preventing the Company from selling its products in the entire California market. Additionally, Legacy XL's conventional hybrid line was out of compliance with California's regulations providing that hybrids with under 35 miles of all-electric range would be ineligible for CARB certification after 2021.

61.     At the time of the Merger, Legacy XL had fewer than 60 full-time employees. In its entire history until December 2020, Legacy XL raised aggregate gross proceeds of $64 million, primarily through private placements of convertible preferred stock and by issuing convertible notes payable. On September 29, 2017 and January 15, 2018, Legacy XL engaged in its final pre-merger Series D round of financing, where it was valued at only $73 million—a small fraction of the $1 billion "implied enterprise value" placed on the Company in connection with the Merger referenced in the September 18, 2020 joint Pivotal II and Legacy XL press release and in other Company statements. Legacy XL also raised $8.1 million in the nine months ending September 30, 2020 through the issuance of convertible promissory notes with a short December 31, 2020 maturity date.

62.     Since at least 2019, Legacy XL regularly recorded losses and by mid-2020 experienced a serious cash shortage, needing outside funds to continue as a going concern. In May 2020, Legacy XL received a $1.1 million loan under the federal government's Paycheck Protection Program, which required it to certify that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." According to the December 8, 2020 Proxy, Legacy XL had a $27.6 million working capital deficit and an accumulated $87.6 million deficit as of September 30, 2020. It incurred $20 million in net losses for the nine months ending September 30, 2020 and $14.9 million overall for 2019, with net losses expected to continue in the short term. With limited cash on hand at the time of the proposed merger, Legacy XL's December 8, 2020 Proxy acknowledged there was "substantial doubt about [its] ability to continue as a going concern." It therefore was desperately attempting to raise cash by going public through a SPAC transaction or through Series E fundraising.

63.     On July 24, 2020, Defendants Ledecky and Hynes—"business acquaintances for 10 years as a result of Mr. Ledecky's decades-long relationship with Mr. Hynes' family"—discussed the possibility of a potential transaction between Pivotal II and Legacy XL. The same day, these companies entered into a non-disclosure agreement. According to the Proxy, "[p]romptly thereafter beginning on July 24, 2020, [Legacy] XL began providing financial projections and other due diligence to Pivotal [II]." Pivotal represented that between July 24th and until signing the Merger Agreement on September 17, 2020, its team conducted due diligence of various areas of Legacy XL's business, including its "commercial operations and contracts, financial results, litigation, legal compliance, intellectual property, tax and general corporate matters." It conducted "further diligence" through "calls with XL suppliers, customers, and investors, as well as competitors and industry experts, which diligence focused on, among other

things, XL's products, market share, and future prospects, as well as the outlook for the sector more generally."

64.     Three days after Ledecky and Hynes's initial conversation, representatives of Pivotal II and Legacy XL participated in an introductory videoconference to discuss the business rationale for a potential transaction and the possibility of combining the companies. Present at the meeting were Defendants Ledecky, Hynes, Griffin, and Sclarsic, among others. Later the same day, Pivotal II sent Legacy XL a draft letter of intent setting forth the proposed terms of a transaction between the companies. The proposed merger was discussed again by videoconference the next day, July 28, 2022, with Defendants Ledecky, Griffin, Sclarsic, Hynes, and Kazarinoff all attending. There, the letter of intent was changed to include a "specific reference to the $1,000,000,000 implied valuation of XL." Legacy XL's board of directors convened a special meeting later on July 28 where it approved and directed Legacy XL representatives to continue discussions with Pivotal II and enter into the revised letter of intent. On August 5, 2020, Legacy XL and Pivotal II signed the revised letter of intent. Between August 6, 2020 and when the Merger Agreement was signed on September 17, 2020, Pivotal II reportedly undertook due diligence regarding Legacy XL and the contemplated merger.

65.     On September 15, 2020—two days before the Merger Agreement was signed— Legacy XL's board passed a resolution stating that "the fair market value of the Company's common stock...is not greater than $4.75 per share" based on "(i) a draft independent third party valuation as of August 5, 2020, prepared by Timan LLC .... and (ii) the [Legacy XL] Board's assessment as of [September 15, 2020]" that there had not been any material events as of that date that "would cause an increase in such valuation." A valuation of Legacy XL's common stock at $4.75 per share implied an equity value of just approximately $55 million on September 15, 2020.

66.     On September 16, 2020, Pivotal II's entire board of directors, Defendant Brady (Pivotal II's CFO), and Defendants Hynes and Kazarinoff from Legacy XL met via videoconference. There, Defendant Ledecky "gave an extensive presentation about the proposed transaction, including potential risks relevant to XL's business, the implied valuation of XL, the pro forma ownership of the post-closing combined company, the fairness to Pivotal [II] and its stockholders of the consideration to be paid by Pivotal [II] in the transaction and the value of XL as a whole being at least equal to 80% of the amount held in Pivotal [II]'s trust account (excluding deferred underwriting commissions)." Pivotal II's board of directors unanimously agreed to the Agreement and Plan of Reorganization (the "Merger Agreement") the next day on September 17, 2020.

## II.     Legacy XL, Pivotal II, and the Individual Defendants Together Hype the Company's Unrealistic Revenue Pipeline and Business Prospects to Drive Interest in the Merger

67.     In the run-up to the Merger and after, the Individual Defendants made several important representations to shareholders, most notably statements regarding XL Fleet's claimed $220 million sales pipeline and exaggerated $75 million revenue projections for 2021.

68.     On September 18, 2020, Legacy XL and Pivotal II issued a joint press release stating that the post-merger entity would have "an anticipated implied enterprise value of approximately $1 billion and no material debt expected to be outstanding." The press release also claimed that "XL has strong demand momentum with a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021." Therein, Defendant Ledecky also stated that "XL's revenues are expected to more than triple in 2021, cementing its status as the leading provider of vehicle electrification solutions for commercial and municipal fleet vehicles." The press release further stated that "[t]housands of XL units [were] already on the road and over 130 million miles [had been] driven by its more than 200 customers, including

FedEx, The Coca-Cola Company, PepsiCo, Verizon, the City of Boston, Seattle Fire Department, Yale University, and Harvard University."

69.     The same day, Pivotal II filed a Form 8-K with the SEC signed by Defendant Ledecky which included a copy of the joint September 18, 2020 press release, a copy of the Merger Agreement, an investor call transcript, and an investor presentation that contained additional representations about XL Fleet's business. The investor presentation slides represented that Legacy XL had a "Low Risk Path to Dramatic Growth" which could be achieved by "[s]elling existing products to existing customers through existing channels" (emphasis in original). The presentation further stated that Legacy XL's hybrid product could improve MPG by around 25% while its plug-in product was "capable of driving up to 50% savings in MPG." The slides touted Legacy XL's "200+ fleet customers" with "Individual Order Sizes Rapidly Growing," highlighting that its largest annual order size grew from 350 units in 2019 to 1,100 units in 2020. Therein, Pivotal II also touted Legacy XL's unique and established production model, which was "ready to scale" to over 100,000 annual units. The presentation also reiterated the "$220m+" sales pipeline for 2021 and that the Company expected a 300% increase in revenue growth over 2020 (projecting $75.3 million in estimated revenue). By 2024, the Company claimed it could achieve revenues exceeding $1.37 billion.[5]

70.     During the September 18, 2020 investor call, Defendant Ledecky hailed Legacy XL as "the most proven and most trusted company in fleet electrification today, with more commercial customers, more miles driven and a broader product offering than anyone else in the market." Defendant Ledecky also expected the Company to generate approximately $1.5 billion

---

[5] On September 21, 2020, an updated investor presentation was filed with the SEC as an attachment to a Form 8-K which made the same representations and added a slide claiming that customers could obtain a 55.7% return on investment.

in revenue in 2024. During the call, Defendant Hynes touted Legacy XL's differentiated product portfolio, claiming that it had garnered it world-class partnerships and was "positioned to leverage the production, supply chain and customer base we have in place today." He portrayed Legacy XL as "very scalable" and a "very trusted name in the [electric vehicle] industry." Finally, Defendant Kazarinoff reiterated the Company's $220 million 2021 sales pipeline, the projected $1.5 billion 2024 revenue figure, and that it could "scale at a rapid pace, [which] differentiates us versus the competition." He also declared that Legacy XL's technology was both "proven" and "trusted."

71.     During an appearance on CNBC's Squawk Box the same day, Defendant Hynes stated that Legacy XL Fleet had "an established supply chain production capacity" and "a very low risk and low-cost production process compared to other companies in the industry." He called the Company "a leader in the industry," with "real value." Regarding 2021, Defendant Hynes unequivocally said, "We'll do over 75 million in revenue next year." Hynes also touted repurchases, saying "we've got major customers that have come back and bought more." A transcript of this interview was filed by Pivotal II with the SEC on September 21, 2020. In a September 2020 interview with IPO Edge, Defendant Ledecky stated he was "confident XL Fleet will be successful" and that the Company was positioned "as a first mover in fleet electrification where their fans—the XL shareholders—should have a winning investment."

72.     On October 2, 2020, Pivotal II filed a preliminary Form S-4 Registration Statement with the SEC seeking shareholder approval for the Merger. This preliminary proxy statement and prospectus was signed by each Pivotal II Defendant: Ledecky, Griffin, Brady, and Sclarsic. Therein, Pivotal II stated that Legacy XL had "a backlog of 961 firm purchase orders representing $12.3M in revenue" as of September 25, 2020. Legacy XL's customers purchased vehicles "with a typical 3 to 6 month lead time," and that "supply is sourced to meet these timelines." The

preliminary proxy statement claimed that "the size of [the Company's] sales opportunity pipeline and committed backlog are important indicators of future performance." Therein, the Company differentiated itself from competitors with "scalable production, supply chain and service" and its "established global customers."

73.     This Form S-4 affirmed the Company's earlier $75 million forecasted revenue for 2021. The Pivotal II Defendants claimed this projection "was prepared on a reasonable basis, reflects the best currently available estimates and judgments, and presents, to the best of management's knowledge and belief, the expected course of action and the expected future financial performance of XL." While acknowledging disruptions in battery supply and original equipment manufacturer ("OEM") vehicle production caused a decrease in the Company's 2020 revenues, the Company placed the primary blame on the COVID-19 pandemic (omitting that Legacy XL had experienced severe battery shortages pre-pandemic and since May 2019). The Pivotal II Defendants then stated that improvements had been made in the second half of 2020 which would "mitigate the supply disruptions experienced during the first half of 2020." Thus, they portrayed these 2020 issues as resolved for purposes of the Company's 2021 operations and prospects.

74.     The October 2, 2020 Form S-4 did not mention that Legacy XL lost its CARB certification in 2019 and had been unable to secure reapproval in 2020 (and thus could not sell its products in California). Instead, it claimed "XL has obtained a number of EOs for prior model years and is in the process of conducting testing against CARB issued test orders for future

products to be introduced into the California market."[6] Regarding MPG gains, the Company reiterated its prior claims, stating hybrid products were "proven to improve MPG by up to 25% over standard gas-powered vehicles" and plug-in products could achieve "up to a 50% MPG improvement."

75.     The October 2, 2020 Form S-4 revealed that Pivotal II's board of directors did not obtain a third-party valuation or fairness opinion in connection with the Merger. Accordingly, "investors will be relying solely on the judgment of Pivotal [II]'s board of directors in valuing XL." The Company nevertheless provided reassurance that Pivotal II's "officers and directors have substantial experience in evaluating the operating and financial metrics of companies from a wide range of industries and have substantial experience with mergers and acquisitions" and that they "conducted significant due diligence on XL." Given their "collective experience and backgrounds," Pivotal II's board of directors concluded that the Merger "was fair from a financial perspective to its stockholders and that XL's fair market value was at least 80% of the assets" currently held in Pivotal II's trust account following the $230 million July 2019 IPO. As of September 18, 2020—the Merger Agreement date—approximately $223 million was held in the trust account (meaning that to satisfy the 80% test, the Company was valued at over $178 million). Based on the foregoing, Pivotal II's board of directors unanimously determined that the Merger and related proposals to be presented at the upcoming annual meeting were "fair to and in the best interest of Pivotal [II]'s stockholders."

---

[6] Because CARB classifies the Company's products as an aftermarket fit system or device, an Executive Order ("EO") must be obtained prior to the sale of these products in the State of California. To secure an EO, the Company had to submit an application to CARB for each vehicle group or family, which is required for each model year.

76.    Pivotal II amended its Registration Statement on November 12, 2020 and December 1, 2020, and then issued its definitive Proxy Statement and Prospectus December 4, 2020. In each amended version of the Registration Statement and the Proxy Statement and Prospectus, the Pivotal II Defendants made the same representations, statements, promises, and assurances contained in the initial October 2, 2020 Registration Statement referenced above, also rendering each substantially identical SEC filing materially false and misleading, as discussed below.

77.    Regarding future orders for the Company's products, the amended Registration Statements and Proxy Statement and Prospectus also stated that "XL's sales and marketing team uses a software tool to track all sales opportunities to existing and potential customers" which was "used by XL management to create projections about future aggregate sales pipeline opportunities." Additionally, "XL management reviews its sales opportunity pipeline data and applies its historic conversion rates of sales pipeline and historical experience with respect to lead time to create revenue projections." Unlike the initial October 2, 2020 Registration Statement, the amended versions and definitive prospectus specifically referenced the Company's $220 million 12-month sales pipeline. These SEC filings cited this $220 million sales pipeline figure as among the bases supporting the satisfaction of the 80% test (requiring any the fair market valuation of any Pivotal II business combination to equal at least 80% of the funds in Pivotal II's post-IPO trust account).

78.    With respect to the earlier reported battery and supply chain issues, the amended Registration Statements and Proxy Statement and Prospectus provided additional assurances these matters were now behind the Company—using the past tense to describe the disruptions. It particular, the Company stated its increased revenue for the third quarter of 2020 was "primarily

due to the resolution of battery supply issues" and that "[r]esolving the battery supply issues allowed XL to increase production and fulfill orders in its outstanding backlog."

79.     On October 26, 2020, Legacy XL and Pivotal II issue another joint press release discussing the proposed merger declaring that Legacy XL was "a trusted brand for over 200 of the largest commercial and municipal fleets in North America" and that it was "revenue-generating today with strong demand momentum, including a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021." The companies also touted Legacy XL's portfolio of products, claiming them "proven to significantly improve fuel economy … over standard gas- and diesel-powered vehicles," quantifying increased fuel economy of between 25-50%. According to the statement, the Company's post-merger "anticipated implied enterprise value" was approximately $1 billion.

80.     The same day, Defendants Hynes and Kazarinoff appeared in a webinar hosted by SPACInsider to promote the Merger. There, Defendant Kazarinoff claimed that the Company's 12-month sales pipeline increased $20 million to total $240 million. He stated, "Our individual order sizes have been growing rapidly as we're seeing folks go from trial to actual adoption, and we've got a 12 months sales pipeline that now is over $240 million, which we feel is going to support our forecast for next year of $75 million in revenue." During the webinar, Pivotal II representative Greg Racz claimed the Company had "real revenue" and "real blue chip customers," with a "very scalable model." Defendant Hynes also stated that the Company was "on the road with major customers" who were "real customers" and again told the public it had over 200 customers. Defendant Hynes also claimed that XL Fleet "vehicles are getting built and then shipped to the end customer, again, anywhere in the U.S. or Canada" and "We're in about every state except for Alaska at this point"—omitting that the Company could not sell its products in

California. Regarding a return on investment (or "ROI"), Defendant Kazarinoff stated that "folks are seeing anywhere from a 50% to 100% return on their premium investment."

81.     On November 12, 2020, Legacy XL issued a press release titled "XL Fleet Generates Record Third Quarter 2020 Revenue." Therein, the Company reaffirmed its aggressive statements concerning its bloated sales opportunity pipeline figure and 2021 revenue projection. Specifically, the Company stated, "XL continues to grow its sales opportunity pipeline for 2021 to $220 million as of today, which supports XL's current revenue forecast of $75 million for fiscal year 2021." In the press release, Defendant Kazarinoff boasted that the Company's record third quarter 2020 revenue was a "testament" to its "proven business model" and that he was "excited by the strong momentum" supposedly experienced by the Company. The same day, Bloomberg TV interviewed Defendant Hynes concerning the Merger. There, Defendant Hynes similarly touted the Company's business prospects, stating, "We've seen tremendous increase in demand from customers over the last two years or so" and "We're growing extremely rapidly … we're already experiencing tremendous growth." He also emphasized Legacy XL's wide customer base, saying "we're in about 49 states at this point" (again failing to specifically mention that the Company could not sell its products in California).

82.     On November 16, 2020, Legacy XL issued a press release titled "XL Fleet Expands XLMTM$^{TM}$ Plug-in Hybrid Elective Drive System For Use in Multiple GM Fleet Applications," again touting the improved fuel economy of its products, claiming they can improve MPG by up to 50% and that the Company's technology was "proven." Therein, Defendant Kazarinoff also reiterated that Legacy XL had "over 200 customers." The same day, Defendant Hynes aggressively promoted the Company's prospects in a webinar hosted by IPO Edge and again in a November 23, 2020 interview with TD Ameritrade. During the IPO Edge webinar, he emphasized the Company's

"highly scalable production capacity," that its vehicles are "shipped anywhere in the country," that "we've seen demand from customers increase significantly over the last couple years," and its "leading customers." During the TD Ameritrade interview, Defendant Hynes similarly proclaimed, "We're putting more units on the road now than any of our competitors and we've got some great customers coming back to buy more and we're really scaling up across the country." Defendant Hynes reiterated that Legacy XL's products were "shipped anywhere in the country."

83.     Just prior to the Merger, on December 1, 2020, the Company announced its launch of the electric vehicle charging station division, known as XL Grid. In its press release that day titled "XL Fleet Launches its XL Grid Division with Charging Infrastructure Solutions," the Company reiterated it had "over 200 fleet customers across the U.S. and Canada." The Company claimed these customers would expectedly "require at least 100,000 charging stations in the next several years based on their growing demand for electric vehicles." Therein, Defendant Kazarinoff enthusiastically stated there was "tremendous demand" for the full slate of the Company's products given its "established track record" and current "portfolio of over 200 customers."

84.     The SEC issued a notice of effectiveness for Pivotal II's Registration Statement on Form S-4 as of December 8, 2020. On that date, Pivotal II filed with the SEC its definitive Proxy Statement for the annual meeting, now scheduled for December 21, 2020, and its Prospectus for the issuance of up to 100 million shares of stock to Legacy XL's shareholders in connection with the proposed merger. Pivotal II's stockholders of record at the close of business on December 7, 2020 would be entitled to vote at the annual meeting on matters including the proposed merger and related ancillary proposals necessary to complete the transaction.

85.     Thereafter, the Company issued another press release on December 8, 2020 wherein Defendant Griffin expressed Pivotal II's "conviction that [the Company] will emerge as a winner

in the vehicle electrification market" and looked forward to XL Fleet "scal[ing] to new heights as a public company." In the same release, Defendant Hynes added that since announcing the proposed merger in September 2020, Legacy XL "has maintained our strong momentum … acheiv[ed] record quarterly revenues … and secur[ed] meaningful new orders." Hynes characterized the Company's "base of over 200 customers" as "expanding," leaving it "well positioned" in the marketplace.

86.     In a final push to drum up enthusiasm for the Merger in the waning days before the annual meeting and vote thereon, the Company issued another press release on December 16, 2020 again touting purported "strong customer demand" for XL Fleet's products and XL Fleet's "growing opportunity pipeline." The release was titled "XL Fleet Expands Electrification Solutions Portfolio to Ford F-550 Chassis to Meet Strong Customer Demand," subtitled "System Brought to Market Within Six Months to Meet Growing Opportunity Pipeline for Hybrid Medium Duty Applications." The Company characterized commercial fleet demand for the electrified F-550 as both "significant and growing" and that XL Fleet was "nimble" to "be very responsive to customer demand." The Company also affirmed its prior representations about its technology, claiming XL Fleet's hybrid electric drive system to be "proven to significantly improve fuel economy."

87.     The above statements—made, approved, and otherwise authorized by the Individual Defendants—were materially false and misleading because they failed to disclose that (a) Legacy XL had materially manipulated and drastically overstated its revenue pipeline figures, (b) Legacy XL had been experiencing serious supply chain problems that significantly impeded its ability to timely fill existing orders, (c) a large number of Legacy XL's customers were inactive and no longer ordering the Company's products, (d) the quality and benefits of Legacy XL's

technology were overstated and that technology did not provide the represented MPG savings or ROI to customers, and (e) as a result of these omissions, the Individual Defendants' rosy assessments of Legacy XL's prospects and projections of future revenues were wildly overstated.

### III.    The Merger Closes on December 21, 2020 and the Individual Defendants Continue Their Campaign of False and Misleading Statements Until the Truth Is Revealed Less Than Three Months Later

88.    On December 21, 2020, the Merger between Pivotal II, Legacy XL, and PIC II Merger Sub Corp. closed following a stockholders' meeting. Of the votes present, 17,723,325 shares voted in favor of the Merger, 8,364 shares voted against, and 12,574 shares abstained. An additional 10,992 shares of Pivotal Class A Common Stock elected to redeem their shares at the approximate price of $10.09 per share in advance of the meeting.

89.    Simultaneously with the Merger, Pivotal II issued 15 million shares in a private investment in public equity ("PIPE") totaling $150 million. Of that amount, MGG Special Opportunities Fund LP—of which Defendant Griffin is the CEO and Chief Investment Officer—purchased 630,000 shares for $6.3 million. On the day the Merger closed, based on XL Fleet's per share closing price, Griffin's shares instantly doubled in value to approximately $12.3 million.

90.    Through the Merger, all of Legacy XL's preferred stock converted into XL Fleet common stock Class A shares. At the time, Defendant Hynes held 150,877 shares of Series D preferred stock (originally purchased for $63,999) and Hynes's father held 109,357 shares of Series D preferred stock (originally purchased for $51,711). On the day the Merger closed, based on XL Fleet's per share closing price, the value of the Hynes family's Series D holdings ballooned to over $5 million. Additionally, Defendants Hynes and Kazarinoff's Legacy XL stock options converted into XL Fleet common stock worth $190 million and over $23.5 million, respectively, as of the closing share price on the day of the Merger.

91.     Furthermore, when the Merger closed, the Sponsor's Founder Shares were worth over $112 million. Those shares had been purchased a year earlier for just $25,000. The 50,000 Founder Shares held by Defendant Sclarsic were worth almost $1 million when the Merger closed. Defendant Brady's 100,000 Founder Shares were now worth approximately $2 million on the same date.

92.     Pivotal II, the surviving combined entity of the Merger, then took on the XL Fleet trade name, with Legacy XL becoming a wholly owned subsidiary of the Company. Following the Merger, prior owners of Legacy XL held approximately 66.1% of the shares of the post-merger XL Fleet; the PIPE investors held 11.6%; and the Sponsor and its affiliates (along with the directors) held 4.4%.

93.     Unsatisfied with their newfound wealth, the Individual Defendants who remained with the Company post-merger continued to falsely represent the Company's business prospects or correct the prior misrepresentations. In its December 22, 2020 press release announcing the Merger, the Company still claimed that XL Fleet was "a leader in fleet electrification" and touted its "growth strategy," "firmly established supply chain, and deep OEM relationships," and "highly scalable business model."

94.     Defendant Hynes was interviewed by CNBC the following day on December 23, 2020. There, Hynes again stood behind XL Fleet's exaggerated sales pipeline figures, overstated revenue projections, and demand for its products:

> Q: I think 2020 forecasted revenue of 21 million, 2021 75 million, but then 2024 forecasted 1.4 billion. How do you get that number? What is your expectation in terms of some of those different levers that you just laid out for growth?
>
> Hynes: We'll we're growing extremely quickly; we're tripling our revenue in the middle of a pandemic, and I think we would we could have done more without the pandemic. So **we have a great pipeline going into 2021** and we also have a very good platform to build off of and introduce a lot more technology and product offerings …

We're clearly leading, shipping hundreds of units per month right now. So *we're in a great position to really expand the market, which clearly has a lot of demand*.

(emphasis added).

95.     On January 13, 2021, the Company filed a Registration Statement on Form S-1 with the SEC and on January 22, 2021 filed a related Prospectus. The January 2021 Form S-1 was signed by Defendants Kazaroff, Hynes, Frodl, Flanagan, Griffin, Hayes, Ledecky, Ramdev, and Sclarsic. Like the October 2020 Registration Statement and amended versions thereof, the January 2021 Registration Statement and Prospectus contained substantially identical representations, statements, promises, and assurances about the strength of XL Fleet's business. Accordingly, these January 2021 SEC filings were likewise false and misleading.

96.     Specifically, the January 2021 Registration Statement and Prospectus stated that XL Fleet had "a backlog of 961 firm purchase orders representing $12.3M in revenue" as of September 30, 2020. XL Fleet's customers purchased vehicles "with a typical 3 to 6 month lead time," and "supply is sourced to meet these timelines." The January 2021 SEC filings claimed that "the size of [the Company's] sales opportunity pipeline and committed backlog are important indicators of future performance." Therein, the Company again differentiated itself from competitors with "scalable production, supply chain and service" and its "established global customers." The Company also claimed that prior battery supply issues were still resolved, stating that, for the quarter ending September 30, 2020, "[r]esolving the battery supply issues allowed us to increase production and fulfill orders in our outstanding backlog." Nor did the January 2021 Registration Statement and Prospectus disclose that XL Fleet lost its CARB certification in 2019 and had been unable to secure reapproval in 2020 (and thus could not sell its products in California). Instead, it again claimed "XL has obtained a number of EOs for prior model years and is in the process of conducting testing against CARB issued test orders for future products to be

introduced into the California market." Regarding MPG gains, the Company reiterated its prior claims, stating its hybrid product was "proven to improve MPG by up to 25% over standard gas-powered vehicles" and its plug-in product could achieve "up to a 50% MPG improvement." Regarding future orders for the Company's products, the January 2021 Registration Statement and Prospectus again stated that "XL's sales and marketing team uses a software tool to track all sales opportunities to existing and potential customers" which was "used by XL management to create projections about future aggregate sales pipeline opportunities." Additionally, "XL management reviews its sales opportunity pipeline data and applies its historic conversion rates of sales pipeline and historical experience with respect to lead time to create revenue projections."

97.     XL Fleet issued additional press releases on January 6, 2021 ("XL Fleet to Participate in Upcoming Virtual Investor Conferences"), February 4, 2021 ("XL Fleet Partnering with Curbtender to Develop All-Electric and Plug-in Hybrid Refuse Trucks"), February 22, 2021 ("XL Fleet to Participate in Additional Virtual Investor Conferences in February and March"), and February 25, 2021 ("XL Fleet Becomes Electric Transportation Partner of UBS Arena and the New York Islanders, Plans to Deploy 1,000 EV Charging Stations").[7] In each of these public statements, XL Fleet claimed to be "a leader" in vehicle "electrification solutions" and touted its purported roster of reputable customers which included The Coca-Cola Company, Verizon, Yale University, and the City of Boston. The press releases further reiterated XL Fleet's representations that its hybrid and plug-in hybrid electric drive systems could increase fuel economy by 25-50%, with the February 25, 2021 press release stating that the Company's fuel economy gains were

---

[7] The February 25, 2021 press release announcing XL Fleet's partnership with UBS Arena and the New York Islanders omitted any reference to the obvious conflicts of interest inherent with this transaction due to Defendant Ledecky concurrently serving on XL Fleet's Board and as a part owner of UBS Arena and the New York Islanders.

"substantial" and "proven." Additionally, in the Company's February 22, 2021 press release, it further claimed that "interest in commercial fleet electrification continues to escalate."

98.     On March 2, 2021, Defendant Hynes appeared on CNBC's Mad Money and again reiterated that the Company had over 200 fleet customers across North America, that XL Fleet was "in about 49 states, I think everywhere but Alaska," and was selling products to municipalities, hospitals, ambulances, shuttle buses, and school buses, among others. He claimed, "We have a very good established customer base."

99.     The above statements—made, approved, and otherwise authorized by the Individual Defendants who remained with the Company post-merger—were materially false and misleading because they failed to disclose that (a) the post-merger XL Fleet had materially manipulated and drastically overstated its revenue pipeline figures, (b) XL Fleet had been experiencing supply chain problems that impeded its ability to timely fill existing orders, (c) a large number of XL Fleet's customers were inactive and no longer ordering the Company's products, (d) the quality and benefits XL Fleet's technology were overstated and that technology did not provide the represented MPG savings or ROI to customers, and (e) as a result of these omissions, the Individual Defendants' rosy assessment of XL Fleet's prospects and projections of future revenue were wildly overstated.

## IV.    Muddy Waters Reveals the Undisclosed Truth About XL Fleet's Shaky Business and Fictitious $220 Million Sales Pipeline in March 2021

100.    From the outside, everything was going smoothly and according to plan for the newly constituted post-merger Company. XL Fleet's sales pipeline appeared robust, it claimed to be on track for 2021 revenues to more than triple its 2020 figures, and the Company's products delivered substantial MPG gains.

101.    Then, on March 3, 2021, Muddy Waters published its bombshell research report titled "XL Fleet Corp. (NYSE: XL): More SPAC Trash." Supported by interviews with XL Fleet's customers and former Company employees, the report exposed: (a) the Company's highly-touted $220 million pipeline as a "fiction created under pressure from senior managers," (b) wildly exaggerated XL Fleet sales projections and figures which caused former XL Fleet employees to "literally laugh[] out loud," (c) XL Fleet's purported robust customer base being "grossly overstated" given its many inactive customers, and (d) XL Fleet's recent $73 million valuation in connection with its Series D financing round. Muddy Waters also reported that reorder rates for the Company's products were extremely low and that many existing XL Fleet customers decided not to reorder due to the products' poor performance, XL Fleet's misleading efficiency claims, and substantial issues with regulatory approval.

102.    More specifically, Muddy Waters deemed XL Fleet "middle of the fairway SPAC garbage" and that its real corporate strength was "duping investors into throwing money at this company through a series of exaggerations, half-truths, and mistruths." According to former XL Fleet salespeople and other personnel, they received internal Company pressure to materially inflate their sales pipelines while also misleading XL Fleet's customers about the purported performance and savings achievable using the Company's products. One Company employee (identified as Former XL Employee A) succinctly explained, "I was paid to lie. I was paid to falsify and exaggerate my pipeline." Former XL Employee B also stated, "Even if [potential customers] have no interest, my boss tells me to go into Salesforce and create an opportunity for 100 chassis with hybrid systems in it… You're talking another $1 million or $2 million that goes into the pipeline that's not really there" (brackets in original).

103.    Given the poor results the Company's products delivered and regulatory problems with CARB approval, Former XL Fleet Employee A ballparked reorder rates at just 10%, stating, "Almost no one reorders." Additionally, of the 33 notable customers XL Fleet regularly promoted, Muddy Waters uncovered that several had only purchased a handful of vehicles under a pilot program and that over half (eighteen) were inactive. For example, Ferguson Enterprises bought "two or three trucks; they haven't repeated the order and it's been three or four years" and Hawaiian Electric purchased three trucks but "will never order again." According to certain of the Company's former employees, these eighteen supposedly current XL Fleet customers had not reordered over at least the 2019 to first half of 2020 period. Among the inactive customers were The Coca-Cola Company, PepsiCo, and Verizon, as depicted below:



41

104.    Muddy Waters also found that the Company's representations about MPG improvements of over 25% and returns on investment of about 56% were misleading. Instead of achieving healthy MPG gains, the March 3, 2021 report stated that "fleet-wide savings are generally only 5% to 10%, and are sometimes negative," while the Company's fleet ROI calculations were "disingenuous" and ROI was actually negative. According to several former XL Fleet employees, the claimed 25% MPG improvements for the hybrid product were cherrypicked, manipulated, and not based on real-world scenarios. Furthermore, one former employee opined "it's insane" the Company advertised 50% savings for the plug-in product because "[n]ever would you come across 50% on the plug-in … You might see a decrease in MPG." The report also identified specific XL Fleet customers that had experienced poor ROI and had ceased ordering products, such as Portland General Electric, PepsiCo, and Alabama Power. Regarding ROI calculations, Muddy Waters found that the Company materially overestimated savings by exaggerating fuel costs, vehicle service life, driver wages, and annual miles driven while underestimating the average cost of XL Fleet's hybrid kits. Adjusting for these unrealistic assumptions, the report estimated that customers' actual ROI was negative 53%.

105.    The March 3, 2021 report highlighted the Company's poor and misleading disclosures regarding its ability to sell XL Fleet products in California and that supply chain woes plagued the Company. The report explains that the Company lost is CARB approval in 2019 and may not sell in California without reapproval. Perhaps more troubling, Muddy Waters suggested that "XL's entire conventional hybrid line with be structurally noncompliant [with California's regulations] by January 1, 2022" because hybrids with under 35 miles of all-electric range (like XL Fleet's hybrid product) cannot get CARB certification after 2021. Regarding supply chain issues, Muddy Waters found that XL Fleet "has been subject to supply shortages for years," while

former Company employees "described a dysfunctional workplace that kept customers waiting for their vehicles for extended periods, often upwards of a year."

106.    Finally, Muddy Waters also cast serious doubt on the viability of XL Fleet's recently announced XL Grid commercial charging product and its February 2021 partnership with garbage truck company Curbtender. The report found the Company's recent announcement about XL Grid was a "sham" because it lacked any proprietary characteristics. Also, based on interviews with former Company employees, the report determined that "refuse trucks are some of the least suitable vehicles to EV-upfit due to their immense weight and highly variable route lengths." One such employee stated, "For garbage trucks, it will never work."

107.    As a result of its investigation and analysis, Muddy Waters concluded there was "little reality to the Blue Sky story with which this stock has been promoted."

108.    The following day, on March 4, 2021, XL Fleet issued a press release responding to the Muddy Waters report. Therein, the Company stated, without any specifics, that "[t]he report contains numerous factual inaccuracies, misleading statements, and flawed conclusions," and that it would further respond "in due course." The Company's follow-on response came via press release on March 8, 2021. XL Fleet's substantive response to the Muddy Waters revelations primarily focused on the report's claims about MPG and ROI figures—holding firm that the Company's products delivered MPG savings exceeding 25% and approximately 56% ROI. Without providing any specifics, the Company also stated generally that it "has steadily increased its revenue through re-orders and increasingly large order sizes from its customers."

109.    On March 10, 2021, Muddy Waters issued another report, titled "XL Fleet: Not Denying Much, Still SPAC Trash." Therein, Muddy Waters noted the Company failed to deny the key misrepresentations in the initial March 3rd report. For instance, "XL did not deny exaggerating

its purported $220 million pipeline" and "did not deny that many of its featured customers have failed to reorder, or that its customer reorder rate is only approximately 10%." The report also noted that "XL did not attempt, defend, justify, or explain its forward projections in any way in its response." Muddy Waters included the following chart in its report:

| MW Claim | Denied? |
|---|---|
| XL management systematically inflates the company's pipeline | No |
| XL's claimed customer base appears grossly overstated | No |
| We understand that at least 18 of 33 touted customers were inactive | No |
| Numerous XL customers have not reordered due to poor performance and regulatory issues - the reorder rate reportedly is only ~10% | No |
| The majority of touted customers are reportedly inactive | No |
| XL's City of Seattle case study misrepresents the results, which were much worse than claimed | No |
| XL does not achieve stated MPG gains | Yes |
| XL does not achieve claimed ROIs | Yes |
| We understand fleet-wide savings are generally only 5% to 10% and sometimes negative | Yes |
| XL's plug-in hybrid also significantly underperforms XL's efficiency claims | Yes |
| XL cherry-picked data and blamed MPG misses on customers' drivers | No |
| XL claims positive fleet ROI of 55.7%, but we adjust to a negative ROI | Yes |
| XL's sales projections are laughably exaggerated | No |
| Despite not being an EV company, XL compares itself to EV players | Yes |
| XL lacks the supply chain and proprietary technology for effective full electrification | Yes |
| XL's actual timeline and cost structure for EV builds are poorly disclosed, raising questions | No |
| XL does not have the engineering talent or knowhow to compete in EVs | Yes |
| Undergraduate interns reportedly filled a number of engineering roles | No |
| XL raised its most recent equity round at ~$73 million, a fraction of its SP. | No |
| XL had significant supply chain woes indicative of a bit player | No |
| There appears little proprietary about XL Grid | No |
| Ford, GM, and Rivian stand to eat XL's lunch in Evs | No |
| Without subsidies, XL's value proposition worsens even further | Yes |

110.    The Company did not issue any response to the March 10, 2021 Muddy Waters follow-on report.

111.    In her February 17, 2022 Opinion and Order from the Securities Class Action, Judge Schofield found that the Muddy Waters reports bore "indicia of reliability."

## V.    Soon After the Muddy Waters Reports, the Company Revoked Its Projected $75 Million Revenue Projection for 2021

112.    On March 31, 2021, XL Fleet announced its fourth quarter and full-year financial results for 2020. In its press release—despite previously projecting $75 million in 2021 revenues—the Company shockingly revealed that its first quarter 2021 revenue forecast was only $1 million. Blaming the COVID-19 pandemic and "significant friction including OEM delays amid microchip and other shortages," the Company withdrew its 2021 financial guidance. Instead of ultimately delivering the previously forecasted $75 million in revenue for 2021 (more than triple the Company's 2020 $20.3 million full-year revenue), 2021 was a complete disaster for XL Fleet. As later announced on March 1, 2022, full-year 2021 revenues fell significantly below even 2020 levels of $20.3 million—and totaled just $15.6 million (almost a 25% decrease).

113.    The truth coming to light through these Muddy Waters reports, the Company's tepid response thereto, and the later withdrawal of 2021 projected revenues of $75 million weeks later caused a steep decline in XL Fleet's stock price. Between March 2, 2021 (the trading day prior to the first Muddy Waters report) and April 1, 2021 (the day after XL Fleet's disappointing announcement regarding 2021 revenue), the Company's common stock share prices fell 49%. During just this one-month period, XL Fleet shares declined from per share trading prices of $15.41 on March 2, 2021 to $7.89 on April 1, 2021. The stock's share price never recovered and now trades below $1.00 per share.

114.    The Company's March 30, 2021 withdrawal of its full year 2021 financial guidance served to effectively confirm the extreme allegations of the Muddy Waters reports. Furthermore, XL Fleet's complete abandonment of its hybrid and plug-in hybrid electric vehicle operations only two years after Merger further evidences that the Company's entire business was essentially a sham. On September 9, 2022, residential solar company Spruce Power was acquired by XL Fleet, and on November 14, 2022 XL Fleet swapped its name with Spruce Power in connection with its pivot away from electric vehicle technology. A month later, on December 19, 2022, the transformation was complete when the Company announced it would cease its prior electric powertrain systems operations.

## VI.   XL Fleet's Highly Touted Vehicle $220 Million Sales Pipeline, Forecasted Revenues, and Backlog Were a Mirage

115.    Confidential witness statements referenced in the Securities Class Action further corroborate the Company's sales pipeline inflation scheme. These witnesses confirm that XL Fleet engaged in intentional conduct to materially overstate its sales pipeline figures and revenue projections at relevant times.

116.    As described above, Pivotal II's November 12, 2020 Registration Statement and other SEC filings explained that "XL's sales and marketing team uses a software tool to track all sales opportunities to existing and potential customers" which was "used by XL management to create projections about future aggregate sales pipeline opportunities." At all relevant times, XL Fleet utilized the Salesforce software system for these purposes. These SEC filings also affirmed that "XL management reviews its sales opportunity pipeline data and applies its historic conversion rates of sales pipeline and historical experience with respect to lead time to create revenue projections."

117.    Multiple confidential witnesses identified in the operative Securities Class Action complaint stated that the Company manipulated the Salesforce system data between at least the fourth quarter of 2019 and the third quarter of 2020 by (a) entering sales opportunities for particular customers in the Salesforce system without a reasonable basis, (b) recording inflated percentage likelihood of sales, and (c) maintaining old entries in the Salesforce system after customers indicated that they would not be ordering products in the amounts recorded (or at all). These data manipulations were undertaken at the direction of XL Fleet's Vice President of Sales and Marketing—Defendant Piern. Additionally, Piern would reportedly frequently override and alter entries in the Salesforce system made by sales personnel to exaggerate and artificially inflate the percentage likelihood of a sale.

118.    For example, according to Former Employee 1 ("FE1")—XL Fleet Regional Sales Manager of Central region from May 2019 until June 2020—Piern and FE1 attended a National Association of Pupil Transportation conference in November 2019. There, FE1 and Piern spoke with five or six OEMs of school buses. Despite these conversations being general in nature and not detailed enough to expect the OEMs to place orders, Piern instructed FE1 to enter a five percent sales opportunity into the Company's Salesforce software for 100 units (equivalent to approximately $1.6 million in potential sales) for each OEM, totaling 500-600 units (equivalent to approximately $8-$9.6 million in potential sales). While at the Company, FE1 reported to Piern. FE1 also initially reported to Defendant Hynes and later to Defendant Kazarinoff.

119.    As another example, at a weekly sales meeting, Piern instructed FE1 to identify large commercial fleets and enter those as sales opportunities even if FE1 had not spoken to anyone at those companies.

120.    In another instance, FE1 was informed by customer PepsiCo that, after purchasing 10 units as a trial run, it would not reorder additional XL Fleet products. FE1 updated the Salesforce software to reflect a zero percent chance of additional PepsiCo sales, but later saw that the data had been changed to reflect a 5% chance likelihood. According to FE1, Piern often upward altered the percentages associated with possible sales entered by XL Fleet salespeople.

121.    According to FE1, all sales opportunities entered into the Salesforce software became part of the Company's sales pipeline.

122.    FE1 further claimed that, due to supply chain problems, the Company's order backlog stagnated at roughly similar levels, without old orders shipping (primarily due to lack of battery supplies), and without new orders coming in. Thus, FE1 believed that XL Fleet's publicly-reported backlog figures were not an accurate reflection of its true capability to generate future revenue.

123.    Former Employee 2's ("FE2") experiences at XL Fleet were similar. FE2 was XL Fleet's Channel Partner Manager for fleet management companies from June 2020 until February 2021 and reported to Defendants Piern and Kazarinoff. Like FE1, FE2 recounted an instance in which Piern directed the artificial maintenance of a sales probability in Salesforce even after information received from a customer indicated that the probability lacked a reasonable basis. In the third quarter of 2020, an individual employed by a potential customer in the elevator industry informed FE2 that it might be interested in purchasing 400 units of products (representing approximately $6 million in sales). FE2 entered this sales opportunity into Salesforce for 2021 with a 75% probability. However, FE2's contact then left the elevator company, and it became clear to FE2 that any purchase would be spread out over a multiple year period. FE2 thus informed Piern before the end of 2020 that this opportunity should no longer be reflected as a 75%

probability of a 400 unit purchase in 2021. Nonetheless, Piern told FE2 to maintain this sales opportunity as a 75% probability in Salesforce.

124.    According to FE2, one practice used to increase XL Fleet's sales pipeline figure was the transmission of pricing information to potential customers. FE2 stated that if pricing was sent to a potential customer, the sales opportunity was increased from 5% to 25% in Salesforce—regardless of whether the potential customer indicated much interest. Therefore, FE2 would often send quotes to potential customers to increase the reported probability of a sale in Salesforce.

125.    FE2 stated that Kazarinoff and Piern met weekly to discuss the Company's sales pipeline.

126.    Former Employee 3 ("FE3")—XL Fleet Regional Sales Manager from November 2018 until June 2020—also stated that Defendant Piern often increased the percentages entered into Salesforce and sometimes even made up "bogus" companies and entered opportunities for those companies. FE3 is the same individual identified as Employee A in the March 3, 2021 Muddy Waters report (stating therein, "I was paid to lie. I was paid to falsify and exaggerate my pipeline."). FE3 had weekly one-on-one meetings with Piern. FE3 also said that Piern directed her to enter sales opportunities for companies in California, which were all false because the Company could not sell in the state given that it had lost CARB approval.

127.    In late November 2020 or early December 2020, FE3 claims to have been contacted by an attorney for Pivotal II in connection with due diligence on the contemplated Merger. FE3 told Pivotal II's attorney about XL Fleet's overstated sales pipeline and issues with the Company's products. After an initial conversation, Pivotal II's attorney called again with an additional four or five other people on the phone and spoke with FE3 for a total of 90 minutes. The topics discussed focused on were the reported MPG savings and ROI for XL Fleet's products, the overstated sales

pipeline, and how XL Fleet was unable to sell its products in California after losing its CARB certification. FE3 was told that Pivotal II representatives would be contacting FE3 again in the future, but FE3 was not contacted further.

128.    Additionally, FE1 corroborated the Muddy Waters report's statements concerning MPG savings, stating that some XL Fleet customers complained that their vehicles' realized MPG actually decreased after purchasing the Company's products.

129.    According to FE2, Defendants Hynes and Kazarinoff told Defendant Piern that the sales team needed to sell $75 million in 2021, and the sales team was not allowed to offer any feedback on whether this figure was achievable.

130.    FE1 and FE2 also both confirmed that certain companies portrayed by XL Fleet as active customers were in fact inactive, had not purchased products in many years, or did not intend to purchase additional products, including PepsiCo, Safelite, Comcast, Verizon, AT&T, UPS, and FedEx.

131.    Finally, according to FE1, the same slides Piern presented to salespeople at the weekly sales meetings concerning the Company's sales pipeline figures were also presented to XL Fleet's full Board.

132.    Defendant Piern left XL Fleet in May 2021, short after the Muddy Waters reports. The Company did not publicly announce, or give any explanation for, his departure.

133.    In her February 17, 2022 Opinion and Order from the Securities Class Action, Judge Schofield found that the operative complaint alleged facts to corroborate these confidential witnesses and that their statements were further corroborated by the March 3, 2021 Muddy Waters report.

## HARM TO THE COMPANY

134.    Unsurprisingly, the SEC has now opened a fact-finding investigation into these matters. On January 6, 2022, the SEC served the Company with a subpoena requesting documents and information relating to the Merger, PIPE financing, sales pipeline and revenue projections, purchase orders, suppliers, CARB approvals, fuel economy for its products, customer complaints, and related disclosures concerning these topics. The investigation is ongoing.

135.    On March 18, 2021, XL Fleet shareholders began filing substantially similar class action lawsuits against the Company and certain of its executive officers in the U.S. District Court for the Southern District of New York. That litigation is now consolidated under the caption *In re XL Fleet Corp. Securities Litigation* (Case No. 1:21-cv-02002-JLR). The plaintiffs in the Securities Class Action allege violations of federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 against XL Fleet and Defendants Ledecky, Brady, Griffin, Hynes, Kazarinoff, and Piern.

136.    The plaintiffs' operative complaint in the Securities Class Action alleges five categories of false and misleading statements: (a) XL Fleet had materially manipulated and overstated its pipeline figures; (b) XL Fleet had been experiencing supply chain problems that impeded its ability to timely fill existing orders; (c) a large number of customers touted by XL Fleet were inactive and no longer ordering the Company's products; (d) the quality and benefits of XL Fleet's technology were overstated and did not provide the represented MPG savings to customers; and (e) as a result of the foregoing omissions, the defendants' rosy assessment of XL Fleet's prospects and projections of future revenue were overstated. By Order dated February 17, 2022, U.S. District Judge Lorna G. Schofield denied the motion to dismiss the Securities Class Action, holding that investors stated actionable claims against the defendants under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995.

137.    Judge Schofield held that the Securities Class Action plaintiffs alleged with particularity that the defendants made false and misleading statements regarding XL Fleet's purported $220 million sales pipeline and revenue projections of $21 million for 2020 and of $75 million for 2021 because they failed to disclose that these figures were materially overstated due to data manipulation by XL Fleet management.[8] Judge Schofield also found that complaint adequately alleged facts showing the Pivotal II defendants (Ledecky, Griffin, and Brady) acted with a "strong inference of scienter"—or intent to defraud—given their substantial involvement in conducting due diligence into XL Fleet in connection with the Merger. Judge Schofield found scienter as to XL Fleet executives Kazarinoff, Hynes, and Piern given their direct involvement in setting Company sales projections and intimate knowledge of XL Fleet's operations.

138.    In her Order, Judge Schofield found that the plaintiffs' complaint alleged, with particularity, facts showing that the Company's publicly reported sales pipeline figures were exaggerated and inflated without sufficient basis—noting the complaint alleged multiple examples of baseless manipulation of sales probabilities totaling millions of dollars in projected sales. The Order also concluded that the complaint adequately alleged that the Company's statements explaining its methodology for the pipeline and revenue forecasting was misleading.

139.    The Securities Class Action has exposed the Company to massive liability for securities fraud.

140.    In addition to the Securities Class Action, on September 20, 2021, XL Fleet shareholders began filing substantially similar lawsuits concerning the Merger in Delaware Chancery Court. That litigation is now consolidated under the caption *In re XL Fleet (Pivotal)*

---

[8] The February 17, 2022 Opinion and Order from the Securities Class Action does not address the remaining categories of alleged false and misleading statements.

*Stockholder Litigation* (C.A. No. 2021-0808-KSJM). In their operative Verified Second Amended Consolidated Class Action Complaint, the plaintiffs in the State Class Action allege (a) direct claims for breach of fiduciary duty against Ledecky, Griffin, Sclarsic, Epstein, Adams, Brady, and Pivotal Investment Holdings II LLC, (b) direct claims for aiding and abetting breach of fiduciary duty against Hynes and Kazarinoff, (c) direct claims for unjust enrichment against Ledecky, Griffin, Sclarsic, Epstein, Adams, Brady, Pivotal Investment Holdings II LLC, Hynes, and Kazarinoff, and (d) a direct claim against XL Fleet for breach of contract. According to its SEC filings, the Company cannot estimate potential losses, if any, related to the State Class Action.

141.    The Individual Defendants have severely harmed the Company. Damages to the Company include substantial loss of shareholder value and significant costs already incurred (and to be incurred) stemming from the events and allegations described herein, including (i) costs defending against the Securities Class Action and the State Class Action, and any judgment against XL Fleet (now Spruce Power) that may issue therefrom, (ii) costs concerning the SEC investigation, and (iii) any fines or other liability resulting from the Company's violations of federal and/or state law.

142.    The Company's business, goodwill, and reputation with its business partners, regulators, and shareholders have also been gravely impaired, and the credibility and motives of management and the Board are in serious doubt.

143.    While the Individual Defendants' actions have severely harmed the Company, each of them has been awarded generous compensation and stock packages and otherwise profited through their wrongful conduct, that additionally should accordingly be recouped.

## **DEMAND WOULD BE FUTILE**

144.    Plaintiff incorporates by reference and reallege each and every allegation above as though fully set forth herein.

145.    Plaintiff brings this action derivatively in the right and for the benefit of Spruce Power pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, to redress injuries suffered by the Company as a direct result of the breaches of fiduciary duty and violations of the federal securities laws by the Individual Defendants alleged herein. Spruce Power is named as a nominal defendant solely in a derivative capacity. Plaintiff will adequately and fairly represent the interests of Spruce Power in enforcing and prosecuting its rights, and Plaintiff has retained counsel experienced in shareholder litigation. Plaintiff is a current Spruce Power shareholder and was a shareholder of the Company at the time of the wrongdoing alleged herein and continuously since that time.

146.    Because current members of the Spruce Power Board lack independence and/or face a substantial likelihood of liability for the acts and omissions complained of herein, prosecution of this action, independent of the current Board, is in the best interests of the Company and its stockholders.

147.    Spruce Power is controlled by its Board, which at the time this action was commenced consists of six members, including Defendants Griffin, Hayes, and Ledecky (together, the "Demand Defendants"), along with non-party director and former CEO Eric Tech, who joined the Company in December 2021, non-party director and current CEO and President Christian Fong, who joined the Company in September 2022, and non-party director John Miller, who joined the Company in March 2022 (collectively, the "Demand Board").

148.    Plaintiff has not made a litigation demand on the Demand Board to institute this action against the Individual Defendants. Any such demand would be a futile and useless act because a majority of the Demand Board (*i.e.*, at least three directors) is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action under the

demand futility analysis set forth in *United Food and Comm. Workers Union v. Zuckerberg*, 262 A.3d 1034 (Del. 2021). Here, demand is excused as futile as to at least four members of the Demand Board.

**Defendants Ledecky and Griffin Are Not Independent**

149.    Defendants Ledecky and Griffin lack independence because they served as the Chairman/CEO and as a director, respectively, of XL Fleet's predecessor, Pivotal II. Defendant Griffin is also an affiliate of Pivotal Spac Funding II LLC, which along with Defendant Ledecky are the two managing members of the Pivotal Investment Holdings II LLC, the Sponsor. Prior to the Merger, Defendants Griffin and Ledecky beneficially owned 19.1% of Pivotal II's Class B common stock following the IPO. They accordingly "ultimately controlled" the Sponsor according to the Company's December 1, 2020 Registration Statement and could "exert a substantial influence on actions requiring a stockholder vote," and would "continue to exert control at least until the completion of [Pivotal II's] initial business combination," as stated in Pivotal II's Prospectus.

150.    Together, Defendants Ledecky and Griffin were responsible for identifying a private company target to merger with Pivotal II. Ledecky was also the principal negotiator on behalf of Pivotal II in connection with the Merger and Ledecky and Griffin both participated in Pivotal II's due diligence into Legacy XL. Defendants Ledecky and Griffin were incentivized to complete the deal with Legacy XL given their significant financial stake in the transaction. The proxy materials in connection with the Merger note that Pivotal II's Sponsor (which was effectively jointly controlled by Ledecky and Griffin) paid an aggregate of approximately $6.35 million for an aggregate of 4,233,333 private placement warrants that would have expired worthless if an initial business combination was not completed. Thus, there was tremendous financial incentive for Ledecky and Griffin to ensure the Merger occurred. As of March 24, 2022,

the Company disclosed that Ledecky beneficially owned 9,739,105 shares of XL Fleet common stock (representing 6.9% of the outstanding shares) and that Griffin beneficially owned 10,369,105 shares of XL Fleet common stock (representing 7.3% of the outstanding shares). These holdings were derived in whole or in part from the Merger, which was premised on false and misleading public statements regarding the Company's growth potential, pipeline, supply chain production capacity, valuation, and business prospects. Defendants Ledecky and Griffin's lack of independence prevents them from impartially considering a demand from Plaintiff.

151.    Ledecky and Griffin are further disabled from considering a demand because they are defendants in the Securities Class Action, where claims for fraud have been upheld against them by Judge Schofield under the particularized pleading standards of the federal securities laws. The pendency of these claims for violating the federal securities laws in the Securities Class Action—where Ledecky and Griffin both face a substantial likelihood of liability—renders it impossible for either Ledecky or Griffin to impartially consider a shareholder demand as to the wrongdoing alleged herein.

**Non-Party Fong Is Not Independent**

152.    Non-party Fong lacks independence because he currently serves as the Company's CEO and President. His position and livelihood depend upon the good graces of the other Demand Defendants. Fong recently joined the Company in September 2022 in connection with XL Fleet's acquisition of Spruce Power. At the time, it was also announced that the Company intended to appoint Fong as CEO by February 15, 2023. Effective February 1, 2023, Fong was appointed CEO when non-party Eric Tech resigned from the position. Fong receives a base salary of $650,000 per year plus an annual bonus target of at least 100% of his salary, the latter subject to the sole discretion of the Board (or the Compensation Committee) and based on his and the Company's

performance. For Fong's 2023 bonus only, if Fong is employed by the Company as of the date such bonus is due to be paid to other executive management team members, the annual bonus will be at least $650,000 (*i.e.*, the target bonus amount). Upon joining XL Fleet and under the Company's 2020 Equity Incentive Plan, Fong was also granted a signing bonus of 909,091 fully vested shares of XL Fleet common stock, restricted stock units which vest over a four-year period subject to Fong's continued employment with the Company, and 1,666,666 restricted stock units which vest if the Company's stock reaches certain price milestones within ten years. Beginning in 2024, Fong will also be eligible to be considered for additional equity compensation awards subject to the sole discretion of the Board (or the Compensation Committee). These amounts are material to Fong, and Fong would never act to jeopardize these substantial payments by pursuing claims against the same directors who determine his compensation and continued employment. For these reasons, Fong would never act adversely to the Demand Defendants in pursuing the claims alleged herein.

**Three of Six Demand Board Members Face a Substantial Likelihood of Liability for Their Wrongful Conduct**

153.    Three members of the six-person Demand Board—Defendants Ledecky, Griffin, and Hayes—face a substantial likelihood of liability for their wrongful misconduct as alleged herein. The Demand Defendants presided over the Company for all or portions of the relevant period alleged herein from September 18, 2020 to March 31, 2021, corresponding to the class period in the Securities Class Action during which false and misleading statements to shareholder and the market were made. These Board members knowingly breached their fiduciary duties to the Company by issuing or causing and/or allowing to be issued false and misleading statements to shareholders in the Company's press releases, SEC filings, and in other public comments concerning (a) the Company's materially manipulated and drastically overstated revenue pipeline

figures, (b) the Company's supply chain problems that impeded its ability to timely fill existing orders, (c) the large number of XL Fleet customers which were inactive and no longer ordering the Company's products, (d) the overstated quality and benefits XL Fleet's technology and this technology's inability to provide the represented MPG savings or ROI to customers, and (e) the Company's prospects and wildly overstated projections of future revenue which occurred as a result of these omissions. Alternatively or in addition to the foregoing breaches, the Demand Defendants face a substantial likelihood of liability for breaching their fiduciaries duties by failing to take any meaningful action to institute appropriate internal and financial controls or otherwise remedy the resultant harm. These actions demonstrate an utter disregard by a majority of the current Demand Board for their fiduciary duties and the integrity of the Company's corporate governance and internal control environment.

154.    Defendants Ledecky and Hayes were members of the Audit Committee at relevant times (the "Audit Committee Defendants"), and therefore had a duty to oversee XL Fleet's compliance with legal and regulatory requirements, including its public disclosures and its risk assessment- and internal control-related functions and other heightened obligations set forth above. In their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made. The Audit Committee Defendants were responsible for knowingly or recklessly issuing or causing and/or allowing to be issued the false and misleading statements alleged herein and thus breached their fiduciary duties to the Company. By allowing documents to be filed with misleading information and/or failing to correct these false statements, the Audit Committee Defendants face a sufficiently significant likelihood of liability

so as to render them interested. Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Additional Demand Futility Allegations**

155.    Demand is further excused because any suit by the Demand Board to address the wrongdoing alleged herein would increase the exposure of Nominal Defendant Spruce Power to liability for violations of the federal securities laws in the Securities Class Action and would potentially result in additional lawsuits being filed against members of the Demand Board. If the Company pursued its rights of action in this case, then the Company's efforts would undercut or even compromise the defense and settlement of the Securities Class Action, making demand futile.

156.    The facts and allegations of wrongdoing set forth in this shareholder derivative complaint closely track and overlap with the facts and allegations at issue in both the Securities Class Action and State Class Action. According to its filings with the SEC, the Company has determined that the allegations asserted in the Securities Class Action and State Class Action "are without merit." Under these circumstances, a pre-suit demand on Spruce Power's Board to pursue the claims at issue herein is excused as futile because the Company has predetermined (incorrectly) that the claims lack merit.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### Against the Individual Defendants

157.    Plaintiff incorporates by reference and reallege each and every allegation above as though fully set forth herein.

158.    As officers and/or directors of XL Fleet (now Spruce Power) and/or Pivotal II, the Individual Defendants owe or owed the Company fiduciary duties of care and loyalty.

159.    By virtue of their positions as officers and/or directors, the Individual Defendants at all relevant times had the power to and did control, influence, and cause the Company to engage in the practices complained of herein.

160.    The Individual Defendants, and each of them, knowingly or recklessly breached their fiduciary duties to the Company by repeatedly approving and issuing false and misleading statements to shareholders and failing to disclose material information related to XL Fleet's 12-month sales pipeline, its forecasted 2020 and 2021 revenues, regulatory approval status, and other key aspects of its business operations.

161.    The Company's alleged liability in the Securities Class Action is a result of the conduct described herein and arises from the knowing, disloyal, and/or bad faith acts and omissions of the Individual Defendants.

162.    The Individual Defendants acted in bad faith and violated their fiduciary duties of care and loyalty owed to the Company.

163.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, the Company has sustained significant damages.

164.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT II**
**Unjust Enrichment**
**Against the Individual Defendants**

165.    Plaintiff incorporates by reference and reallege each and every allegation above as though fully set forth herein.

166.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of the Company.

167.    The Individual Defendants were unjustly enriched as a result of the compensation and stock they received and other profits collected while breaching their fiduciary duties and issuing false and misleading statements to shareholders.

168.    Plaintiff, as a shareholder and representative of the Company, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all their profits, benefits, and other compensation obtained by reason of the wrongful conduct and breaches of fiduciary duty alleged herein.

169.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT III

**For Contribution Under §§10(b) and 21D of The Exchange Act
Against Defendants Ledecky, Griffin, Hynes, Kazarinoff, Brady, and Piern**

170.    Plaintiff incorporates by reference and reallege each and every allegation above as though fully set forth herein.

171.    Defendants Ledecky, Griffin, Hynes, Kazarinoff, Brady, and Piern are named defendants in the Securities Class Action.

172.    Spruce Power is also named as a defendant in the Securities Class Action, where the plaintiffs assert claims under the federal securities laws for, *inter alia*, violations of Sections 10(b) and 20(a) of the Exchange Act. If and when the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of these defendants as alleged herein. The Company is entitled to receive contribution from Defendants Ledecky, Griffin, Hynes, Kazarinoff, Brady, and Piern in connection with the Securities Class Action against the Company.

173.    Defendants Ledecky, Griffin, Hynes, Kazarinoff, Brady, and Piern, because of their positions of control and authority as directors, officers and otherwise, had the power and/or ability

to, and did, directly or indirectly, control or influence the Spruce Power's general affairs, including the content of public statements about the Company, and had the power and/or ability, directly or indirectly, to control or influence the specific corporate statements and conduct complained of herein and in the Securities Class Action that violated Section 10(b) of the Exchange Act and Rule 10b-5.

174.    Defendants Ledecky, Griffin, Hynes, Kazarinoff, Brady, and Piern are liable under Section 10(b), 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act. As a result, Defendants Ledecky, Griffin, Hynes, Kazarinoff, Brady, and Piern damaged Spruce Power and are liable to the Company for contribution or indemnification.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Spruce Power, demands judgment against the Individual Defendants, and each of them, jointly and severally, as follows:

(a)    Determining that this action is a proper derivative action and that Plaintiff is an appropriate representative of the Company for said action;

(b)    Determining that a litigation demand on the Board would be futile;

(c)    Declaring that each of the Individual Defendants breached their fiduciary duties to the Company and were unjustly enriched as set forth above;

(d)    Determining and awarding to the Company the damages sustained by it as a result of the breaches set forth above, or disgorgement or restitution, from each of the Individual Defendants, jointly and severally, together with interest thereon;

(e)    Awarding to Plaintiff the costs and disbursements of this action, including reasonable fees and costs to Plaintiff's attorneys, accountants, and experts; and

(f)     Granting such further relief as the Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.


Dated: March 16, 2023                                 Respectfully submitted,

                                                      **deLeeuw Law LLC**

                                                      */s/ P. Bradford deLeeuw*
                                                      P.  Bradford deLeeuw (Del. Bar No. 3569)
                                                      1301 Walnut Green Road
                                                      Wilmington, DE 19807
*Of Counsel:*                                         (302) 274-2180
                                                      brad@deleeuwlaw.com
Robert C. Schubert
Willem F. Jonckheer
Dustin L. Schubert                                    *Counsel for Plaintiff*
**Schubert Jonckheer & Kolbe LLP**
2001 Union St., #200
San Francisco, CA 94123
(415) 788-4220
rschubert@sjk.law
wjonckheer@sjk.law
dschubert@sjk.law